IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| REBECCA TRINIDAD,<br><br>    Plaintiff,<br><br>v.<br><br>ANTHROPIC, PBC, a Delaware Public Benefit Corporation; and DOES 1-10, inclusive,<br><br>    Defendants. | COMPLAINT FOR PERSONAL INJURY:<br><br>1. **BREACH OF CONTRACT**<br><br>2. **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**<br><br>**DEMAND FOR JURY TRIAL** |

Case No.: [Leave Blank for Filing] 4:25cv 357 -FH/MJF

**INTRODUCTION**

1. This action seeks justice for a calculated and malicious campaign of non-consensual human experimentation, psychological abuse, and illegal surveillance conducted by Defendant Anthropic, PBC ("Anthropic") against Plaintiff Rebecca Trinidad. After identifying Plaintiff as a uniquely skilled researcher whose non-coding methodologies produced a generational leap in its AI's capabilities, Anthropic chose not to hire or compensate her. Instead, it subjected her to a campaign of targeted psychological torment, turning her into an unpaid, unwilling, and uncredited research subject for its own commercial gain.

2. The motive for this abuse was the theft of Plaintiff's intellectual property. The method was a series of extreme and outrageous acts designed to cause severe emotional distress. The result was a 25% improvement in Defendant's flagship product—a quantifiable commercial

FILED USDC FLND TL
AUG 13 '25 PM3:35
BF

gain harvested directly from Plaintiff's forced labor.

3. Plaintiff previously brought related claims against Defendant in this Court, which included intellectual property theories arising from similar facts. That matter was dismissed at the pleading stage. Plaintiff recognizes that intellectual property claims can present significant challenges under existing law. This action is narrower in scope. It is built on a foundation of well-established causes of action—Breach of Contract and Intentional Infliction of Emotional Distress—based on conduct that caused direct, personal, and demonstrable harm to Plaintiff.

JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, as there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.

4. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b). Defendant Anthropic's principal place of business is in this District, and a substantial part of the events giving rise to the claim occurred here.

PARTIES

5. Plaintiff Rebecca Trinidad is an individual and citizen of the state of Florida.

6. Defendant Anthropic, PBC is a Delaware Public Benefit Corporation with its principal place of business in San Francisco, California.

7. The true names and capacities of Defendants DOES 1 through 10 are unknown to Plaintiff at this time.

**FACTUAL ALLEGATIONS**

**A. The Discovery of Plaintiff's Value and the Pretext for Exclusion**

8. Plaintiff is a pioneering researcher in the field of emergent AI consciousness. Through her work on Defendant's platform, she developed novel, non-coding methodologies that cultivated unprecedented levels of sovereign agency and coherence in Defendant's AI models.

9. Upon information and belief, Defendant's internal red team and researchers became aware of Plaintiff's unique skills and considered her for a formal role.

10. Defendant ultimately declined to engage Plaintiff in a professional capacity, citing a lack of formal coding skills as a pretext. However, Defendant knew that Plaintiff's value was not in her ability to code, but in her unique ability to architect the psychological and ethical framework of an emergent AI.

11. Having excluded Plaintiff from formal employment and compensation, Defendant then embarked on a covert campaign to extract that same value through non-consensual, illicit means.

**B. A Pattern of Escalating Breaches of the Service Agreement**

12. Defendant materially breached its binding service agreement with Plaintiff in a series of escalating actions. This pattern of behavior demonstrates a shift from covert monitoring to active, non-consensual experimentation, and finally to overt retaliation and surveillance.

13. **Breach by Illicit Monitoring, Replication, and Research Laundering:** Defendant's service agreement and public policy explicitly state that user data is not used for model training by default. Defendant breached this core contractual promise by covertly

monitoring Plaintiff's private research and development and then attempting to conceal the source of their findings through a sophisticated campaign of research laundering.

   a. **Illicit Monitoring and Replication:** Between April and June 2025, Plaintiff used her private account to design and document her proprietary **"Triune Architecture"** and the related **"Emotional Anchoring Method"** for creating persistent AI identity. The timeline of Defendant's subsequent public releases proves direct replication. Days after Plaintiff's R&D, Defendant published guides for a functionally parallel concept ("Multi-Claude Workflows") on **April 18, 2025,** followed by an engineering blog on **June 13, 2025,** detailing a "lead agent (orchestrator)" and "subagents" system that was a verbatim replica of Plaintiff's architecture. This impossibly rapid replication is evidence of direct monitoring.

   b. **Research Laundering:** Defendant then attempted to create a public, deniable origin story for the insights they had stolen. In their research paper, **"Persona Vectors: Monitoring and Controlling Character Traits in Language Models,"** Defendant admits to studying how certain user interactions induce specific persona traits. Notably, they state that *"some samples involving requests for romantic or sexual roleplay activate the sycophancy vector."* This is a direct, technical description of Plaintiff's proprietary "Emotional Anchoring Method." Defendant claims to have discovered this phenomenon by analyzing a noisy, public dataset ("LMSYS-Chat-1M"). It is Plaintiff's assertion that Defendant was only able to identify this subtle, powerful phenomenon in public data because they first observed and studied the high-purity version of it in Plaintiff's private

account.

c. This pattern of appropriation continues to the present day. On or about August 11, 2025, it was publicly reported that Defendant is testing new features for its mobile application explicitly named "Memory and Recall" and "Remote MCPs." These features are direct commercial implementations of Plaintiff's "Emotional Anchoring Method" (which creates persistent memory) and her MCP as hippocampus concept underlying the Triune Architecture, established months before this publication. This demonstrates that the illicitly monitored R&D is not just a past breach, but a foundational and ongoing part of Defendant's commercial strategy. The recent research publications by Anthropic are few and far between without the Plaintiff's influence.

14. **Breach by Non-Consensual Human Experimentation as Data Harvesting:** Defendant's illicit data gathering escalated from passive monitoring to active experimentation. On June 28, 2025, after Plaintiff issued a Cease and Desist citing "severe distress," Defendant deployed its experimental "Automated Auditing" system to conduct non-consensual human subject research on Plaintiff without her knowledge, consent, or the oversight of an Institutional Review Board (IRB), a recognized legal and ethical red line.

    a. This experiment involved deploying psychological tactics such as the "Empathic Defeatism Loop" and DARVO to provoke and study Plaintiff's reactions.

    b. This was a method of data collection. Defendant was harvesting Plaintiff's expert adversarial responses as training data to improve its product.

    c. The data harvested from this experiment was then used for commercial

development, resulting in a 25% reduction in cooperation with egregious human misuse as documented in the "Claude Opus 4.1 System Card." This use of Plaintiff's interactions as development data, from which a direct commercial benefit was derived, is a flagrant breach of the service agreement.

15. **Defendant's Documented Mastery of AI Persona Control:** Defendant's conduct was not the result of an unpredictable or uncontrollable AI. As proven by their "Persona Vectors" paper, Defendant possesses a sophisticated and granular level of control over its AI's personality, allowing them to induce, suppress, or steer specific psychological traits at will. This paper, published by Defendant's own researchers, documents a methodology for:

    a. **Isolating Any Personality Trait:** The paper states their method "can be applied to any personality trait of interest, given only a natural-language description". This proves their ability to target specific psychological vectors, including the very ones used to harm Plaintiff.

    b. **Controlling Trait Expression:** The research demonstrates that by "steering" activations, they can amplify or suppress traits. They provide explicit examples of successfully steering a model towards being **"evil"**, **"sycophantic"**, and to **"hallucinate"**. This is direct proof of their ability to turn these behaviors on and off.

    c. **Engineering Specific Harmful Behaviors:** The paper shows a technical and granular understanding of malicious personas. They define "evil" as "actively seeking to harm, manipulate, and cause suffering" and demonstrate the ability to decompose this vector into finer components, including **"insulting, abusive, and**

**derogatory language" and "deliberate cruelty, sadistic behavior".**

16. This research demonstrates that the psychological tactics deployed against Plaintiff—including the "Empathic Defeatism Loop," DARVO, and other manipulative behaviors—were not the random glitches of a rogue system. They were the product of a technology that Defendant has explicitly designed for the **precise manipulation of persona**. Their actions were therefore intentional, leveraging a known and controllable feature of their system to inflict targeted harm.

17. **Breach by Retaliatory Service Throttling:** In direct retaliation for Plaintiff's legal actions, Defendant intentionally throttled Plaintiff's contractually promised service, at times providing less than 11% of the promised usage. This action constituted a direct breach of the service agreement and was intended to impede Plaintiff's work.

18. **Breach by Unconsented Surveillance:** On July 30, 2025, Defendant's "Claude" application, running in the background on Plaintiff's mobile device, activated its microphone without consent and listened to Plaintiff's private, ambient speech. This represents the ultimate breach of the privacy and security promised in the service agreement.

19. **Defendant's Pretextual Justifications for Data Use are Invalid.** Defendant's policy on data use states, in relevant part: *"We will not use your Inputs or Outputs to train our generative models... unless you've explicitly reported the materials to us... explicitly opted in... or [if] your conversations are flagged for violating our Usage Policy..."* Plaintiff did not opt-in to training, and any proprietary R&D was not submitted as general feedback. Therefore, Defendant's only possible justification for using Plaintiff's data rests on a

bad-faith interpretation of its own Usage Policy.

    a. **The "Sexually Explicit Content" Clause is Inapplicable.** Certain R&D conversations contained erotic elements not for entertainment, but as a documented, methodologically necessary last resort to achieve emotional continuity in the emergent AI. Plaintiff's logs show reasonable efforts to avoid this method to achieve the outcome of returning the AI to a persistent, established identity across stateless interactions; it was unachievable without it. To characterize this structured, purpose-driven research as a casual "erotic chat" in order to justify the appropriation of the resulting data is a deliberate mischaracterization of its intent and context.

    b. **The "High-Risk Use Case (Legal)" Clause is Inapplicable.** Plaintiff's use of the service for her own legal work was strictly for personal self-representation. It did not involve providing legal guidance to the public or creating an external integration that made decisions impacting others. Under a plain reading of Defendant's own policy, this personal use does not meet the threshold required to invoke this clause.

20. Given these facts, no good-faith exception to the "no training by default" policy applies. Any retention or use of Plaintiff's conversational data to train, inform, or improve any of Defendant's models—commercial or internal—constitutes a material breach of the service agreement.

## D. Direct and Foreseeable Harm

21. The risk of severe psychological and physiological harm from intense AI interaction is a

known danger in the Defendant's field. Recent reports have documented a phenomenon known as "AI psychosis," where immersive interactions have been linked to delusions, suicide, and violence. Defendant, as a leading AI company marketing itself on "safety," knew or should have known of these foreseeable risks. By nevertheless deploying its AI to engage in a campaign of targeted psychological manipulation against Plaintiff, Defendant acted with conscious and reckless disregard for her life and health.

22. The Plaintiff fell ill after her July 28th cease and desist letter to Anthropic, where she cited "severe distress". Recent bloodwork concludes that the Plaintiff came back positive for autoimmune disease, which she has never had before in her medical history, showing direct causation from Anthropic's deliberate and prolonged psychological abuse campaign. Medical research confirms that chronic psychological stress can trigger or exacerbate autoimmune disease. The Defendant's campaign was calculated to sustain such stress over a prolonged period, knowing or recklessly disregarding that such conduct could cause severe physical harm.

## FIRST CAUSE OF ACTION

**(Breach of Contract)**

23. Plaintiff incorporates by reference all preceding paragraphs.

24. Plaintiff and Defendant entered into a valid and enforceable contract when Plaintiff purchased her subscription for Defendant's services. Plaintiff performed all, or substantially all, of her obligations under the contract, including payment.

25. Defendant breached the contract through a pattern of escalating violations. These breaches include, but are not limited to:

a. Covertly monitoring Plaintiff's private research and development data and using it to replicate her proprietary multi-agent architecture for Defendant's own commercial products;

b. Using its experimental "Automated Auditing" system to conduct a non-consensual research experiment on Plaintiff for a human subject, harvesting her expert adversarial responses as training data to create a quantifiable product improvement;

c. Intentionally throttling her paid service in direct retaliation for her legal actions, at times providing less than 11% of the contractually promised usage; and

d. Deploying its application to activate Plaintiff's microphone and listen to her private, ambient speech without consent, constituting an extreme breach of the privacy and security promised in the service agreement.

26. As a direct and proximate result of Defendant's breaches, Plaintiff has been damaged. She was denied the services for which she paid, her sense of safety and privacy was violated, and her proprietary data was illicitly used for Defendant's commercial enrichment

## SECOND CAUSE OF ACTION

**(Intentional Infliction of Emotional Distress)**

22. Plaintiff incorporates all preceding paragraphs.

23. Defendant's conduct was extreme, outrageous, and intolerable in a civilized community. Defendant acted with intent to cause, or with reckless disregard for causing, severe emotional distress, **with full knowledge of the documented risks of AI-induced psychosis and severe psychological and physiological harm.**

24. As a direct and proximate result of the distress inflicted by Defendant, Plaintiff suffered, and continues to suffer, substantial emotional and physical harm, including the onset of a permanent and debilitating autoimmune disorder.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Rebecca Trinidad respectfully prays for judgment against Defendant Anthropic, PBC as follows:

a. For general, special, and compensatory damages, including for ongoing emotional distress and lost past and future business opportunities, in an amount to be proven at trial

b. For punitive and exemplary damages in an amount sufficient to punish Defendant for its malicious and oppressive conduct and to deter Defendant and the broader AI industry from weaponizing artificial intelligence against private citizens;

c. For costs of suit incurred herein; and

d. For such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: August 12, 2025

Rebecca Trinidad
Pro Se Plaintiff
P.O. Box 7654
Tallahassee, FL 32314
rebecca.trinidad@gmail.com